NO. 4-01-0239

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

SHIELDS PORK PLUS, INC.,

          Plaintiff-Appellant and                 Cross-Appellee,

          v.

SWISS VALLEY AG SERVICE,

          Defendant-Appellee and                  Cross-Appellant.

)

)

)

)

)

)))

Appeal from

Circuit Court of

Champaign County

No. 98L386

Honorable

John R. DeLaMar,

Judge Presiding.

_________________________________________________________________

JUSTICE COOK delivered the opinion of the court:

Plaintiff, Pork Shield Plus, Inc., and defendant, Swiss Valley Ag Service, entered into a contract for the sale of feeder pigs.  Under this contract, plaintiff was to provide high-quality feeder pigs "of a Newsham line" to defendant, who would then resell the pigs to its customers.  Plaintiff claimed the defendant breached the contract when it did not accept a portion of a delivery under the contract.  Defendant counterclaimed, arguing that plaintiff breached the contract when it abandoned all efforts to convert its pig herd to 100% Newsham genetics.  Both parties have appealed the trial court's judgment finding that both parties had repudiated the contract.  We affirm in part, reverse in part, and remand.

I. BACKGROUND

In the latter part of 1997, plaintiff and defendant began negotiations regarding the purchase and sale of feeder pigs--weaned pigs weighing between 35 and 60 pounds.  At that time, plaintiff's herd was made up of pigs from the Newsham, Liske, and Duroc genetic lines.  Representatives of defendant expressed an interest in purchasing 100% Newsham pigs.  The vice-president of plaintiff, Phillip Shields (Shields), informed defendant that he had a fairly young herd of sows, mostly Liske, so he did not need to buy any in the immediate future.  Nevertheless, Shields informed defendant that when the Liske sows needed to be replaced, they would be replaced with Newsham gilts--nonpregnant female pigs--which would be bred with Newsham boars or Newsham semen.

A representative of defendant acknowledged that the full conversion to Newsham would likely take more than one year.  Similarly, plaintiff was aware that defendant was not the final purchaser of the pigs, but would be reselling the pigs to its feed customers.  Nevertheless, both parties entered into the sales contract in February 1998 and negotiated a price term based upon the weight of the pigs and the price of a pig futures contract the week of delivery.  The term of the contract was 36 months, with monthly shipments to be made according to an attached schedule.  The record does not include such a schedule but, rather, a computation of damages based upon the alleged schedule.  However, the recitations of the contract indicate that both parties anticipated that each monthly shipment would number approximately 600 pigs.

The contract provided, in paragraph 2, that plaintiff was to "put forth its best effort to provide healthy[,] high[-]

quality feeder pigs."  Further, a pig was defined under the contract as "merchantable" if it weighed between 35 and 65 pounds and was "progeny from a Newsham line then sold commercially in the United States."  Any change in the genetic makeup of the herd was to be approved by the defendant.

Under the contract, defendant was responsible for transporting the pigs from plaintiff's farm.  The contract also listed several reasons why pigs could be rejected or discounted at the time of delivery.  According to the contract, any pig could be rejected if, upon delivery, it was ruptured, splay-legged, crippled, or sick, or if the pig's tail had not been docked.  Further, the contract permitted the seller to reject any pig that did not "meet the criteria set forth in [the section defining merchantability and genetic makeup]."

On March 13, 1998, defendant took delivery of an initial shipment of 600 pigs and accepted all of the pigs as conforming to the contract.  The second delivery under the contract, scheduled for April 24, 1998, was allegedly to be of 680 pigs.  However, at the time the plaintiff tendered the pigs, defendant only accepted 380 of the 680 pigs, stating that one of its subsequent purchasers had no need for additional pigs.  A representative of defendant met with plaintiff to discuss the 300 pigs that were not accepted.  At that time, according to defendant, plaintiff indicated that the rejected pigs would be sold elsewhere.  Plaintiff did not demand that defendant accept the 300 pigs.

Thereafter, until August 1998, both parties performed under the contract.  While the record is inconclusive as to the number of pigs to be delivered in each of these four months, the parties appear to agree that full performance was tendered by both parties.  Each month, plaintiff tendered approximately 600 pigs, the majority of which were accepted by defendant.  Defendant rejected 23 pigs in the June 1998 shipment of 675 pigs, which were replaced by plaintiff.  Defendant further rejected 23 pigs in one of two July 1998 shipments, which were also replaced by plaintiff.

According to defendant, in June 1998, one of defendant's ultimate purchasers of the pigs, David Catlett, advised defendant of performance problems with some of the pigs that defendant had purchased from plaintiff.  Catlett told defendant that he had met with a representative of plaintiff that month and had been advised that plaintiff was not purchasing Newsham gilts, but was producing Newsham gilts himself.  According to Catlett, a 100% Newsham pig could not be produced through such a process.

Similarly, defendant's expert, Dr. Kevin Eggers, a veterinarian, testified that at the same meeting, Shields told him that plaintiff had stopped buying Newsham gilts because it could not afford to financially.  Dr. Eggers further testified that a Newsham pig cannot be made from anything other than Newsham parents.

On August 3, 1998, plaintiff delivered 600 pigs to defendant, which were accepted by defendant.  However, shortly after the delivery, a representative of defendant contacted plaintiff and reported some problems with some of the pigs in the shipment.  Plaintiff offered to replace the problem pigs, but defendant refused.  Further, defendant notified plaintiff that it would no longer accept any pigs from plaintiff under the contract, citing the refusal of defendant's ultimate purchasers to accept the pigs.  Plaintiff responded by informing defendant it would sell the remaining pigs on the open market.

On December 8, 1998, plaintiff filed a complaint against defendant for breach of contract, seeking damages for defendant's rejection of the 300 pigs in April 1998, as well as for all scheduled deliveries after August 3, 1998.  On January 7, 1999, defendant filed an answer and counterclaimed against plaintiff for failure to provide merchantable pigs under the contract.

After a bench trial, the trial court found that both parties had repudiated the contract, and it denied both damage claims on February 19, 2001.  Both parties timely filed notice of appeal in March 2001, but defendant has waived its cross-appeal.

II
. ANALYSIS

A. The Parol Evidence Was Properly Considered

It is axiomatic that a court's principal goal in construing a contract is to ascertain and give effect to the parties' intent at the time they entered the contract.  
USG Corp. v. Sterling Plumbing Group, Inc.
, 247 Ill. App. 3d 316, 318, 617 N.E.2d 69, 70 (1993).  Thus, if the contract terms are unambiguous, the parties' intent must be ascertained exclusively from the express language of the contract (
Farm Credit Bank of St. Louis v. Whitlock
, 144 Ill. 2d 440, 447, 581 N.E.2d 664, 667  (1991)), giving the words used their common and generally accepted meaning.  
Clay v. Illinois District Council of the Assemblies of God Church
, 275 Ill. App. 3d 971, 978, 657 N.E.2d 688, 692 (1995).

Therefore,"when the language used is susceptible to more than one meaning [citation] or is obscure in meaning through indefiniteness of expression [citation]," a contract is properly considered ambiguous.  
Wald v. Chicago Shippers Ass'n
, 175 Ill. App. 3d 607,  617, 529 N.E.2d 1138, 1145 (1988).  This does not mean, however, that the parties' disagreement regarding how to interpret the terms of a contract, in itself, renders the contract ambiguous.  
USG Corp.
, 247 Ill. App. 3d at 318, 617 N.E.2d at 71.  The determination of whether a contract is ambiguous is a question of law for the court.  
Clay
, 275 Ill. App. 3d at 977, 657 N.E.2d at 692, citing 
Quake Construction, Inc. v. American Airlines, Inc.
, 141 Ill. 2d 281, 288, 565 N.E.2d 990, 994 (1990).  But once the court determines that the contract is ambiguous, parol evidence may be considered by the trier of fact in determining the parties' intent.  
Rybicki v. Anesthesia & Analgesia Associates, Ltd.
, 246 Ill. App. 3d 290, 300-01, 615 N.E.2d 1236, 1244 (1993).  

Since the finding of ambiguity by the trial court is a matter of law, we may review the trial court's finding independently, in the manner of a 
de
 
novo
 review.  
Yamnitz v. William J. Diestelhorst Co.
, 251 Ill. App. 3d 244, 251, 621 N.E.2d 1046, 1051 (1993).  Thus, we are presented with plaintiff's assertion that the trial court (a) improperly assumed that the contract was ambiguous, and (b) admitted parol evidence to explain the ambiguity.  We will first address the question of ambiguity.

At the very heart of the parties' dispute is the section of the contract which requires all pigs under the contract to be "progeny from a Newsham line."  Defendant suggests that this implies a requirement that both the boar and the sow be 100% Newsham.  Plaintiff counters that while the phrase "Newsham progeny" may be susceptible to more than one interpretation, the phrase "progeny from 
a
 Newsham line" (emphasis added) is not.  According to plaintiff, since there are two blood lines, that is, a male and female, producing any "progeny," the use of the word "a" implies that just one of the lines must be Newsham.

While we are mindful that the parties' mere disagreement as to the definition of a contract term is not, of itself, reason to find ambiguity in a contract (
USG Corp.
, 247 Ill. App. 3d at 318, 617 N.E.2d at 71), we cannot agree that the phrase "progeny from a Newsham line" was sufficiently clear to avoid the finding of ambiguity.  "Progeny" can be variously defined as "descendants; children; offspring of animals or plants" (Merriam-Webster's Collegiate Dictionary 929 (10th ed. 2000)) or "[t]he offspring (of a father or mother, 
or
 
of
 
both
)" (Emphasis added)  (12 Oxford English Dictionary 585 (2d ed. 1989)).  It remains unclear from the face of the contract what is intended by the word "progeny."  Must the pigs be the result of breeding a Newsham male, a Newsham female, or both?  As to this question, the contract elucidates very little.

But the term "progeny" is not the only source of the contract language's ambiguity; the phrase "Newsham line" is ambiguous as well.  The fact that the word "Newsham" is a commercial description, a shortened form of Newsham Hybrids International, particularly persuades us in this regard.  As a reference to the name of a company that markets and sells genetic material for animal husbandry, "Newsham" might simply be descriptive of the company's products or of the animals that result from their use.  Thus, by using the phrase "Newsham line," did the parties intend that the animals to be bred must be Newsham or, rather, that the material used to breed be from the Newsham company?

In the light of these many uncertainties, we conclude that the trial court did not err in finding the contract ambiguous.  This was confirmed at trial by the differing opinions of the parties' expert witnesses, all of whom the trial court found to be credible.  Dr. Shipley, a veterinarian witness for the plaintiff, testified that, as worded, the contract would require only that the boar be Newsham, while another witness for the plaintiff opined that either the boar or the sow could satisfy the contract's requirements.  Then, defendant's expert witness, Dr. Eggers, stated that both the sow and the boar must be Newsham to make a Newsham pig.  This testimony only further convinces us of the soundness of the trial court's decision that the contract was ambiguous.

Plaintiff has suggested that, had the parties desired 100% Newsham pigs, such a term easily could have been included.  We recognize, at plaintiff's suggestion, that a presumption exists in Illinois "against provisions that easily could have been included in the contract but were not" and that "[a] court will not add another term about which an agreement is silent."  
Klemp v. Hergott Group, Inc.
, 267 Ill. App. 3d 574, 581, 641 N.E.2d 957, 962 (1994).  But this is not a case where an uncertainty exists as to the existence of a contract term.  Rather, the uncertainty in the case at bar exists within the meaning of contract terms that 
were
 used.  The parties 
did
 include a term purporting to describe the genetic makeup of the pigs to be sold: "progeny from a Newsham line."  The fact that this particular phrase is ill-defined does not, and cannot, mean that the parties intended the contract to be silent as to that term.  For that reason, and those outlined above, we hold that the trial court properly found the contract ambiguous.

Having found that the trial court properly determined the contract's ambiguity, it follows that the parol evidence regarding the intent of the parties was not admitted in error.  
Rybicki
, 246 Ill. App. 3d at 300-01, 615 N.E.2d at 1244.  As we stated in 
Rybicki
, "'[i]f the previous negotiations make it manifest in what sense [the parties] understood and used [the contract's] terms, they furnish the best definition to be applied in the construction of the contract itself
.'"  
Rybicki
, 246 Ill. App. 3d at 299-300, 615 N.E.2d at 1243, quoting 17A Am. Jur. 2d 
Contracts
 §403, at 429 (1991).

Moreover, even if we assume, 
arguendo
, that the parol evidence was not properly considered, plaintiff has waived the issue.  Evidence violating the parol evidence rule can be considered if not objected to at trial.  
Dremco, Inc. v. Hartz Construction Co.
, 261 Ill. App. 3d 531, 534, 633 N.E.2d 884, 887 (1994).  Further, even if the plaintiff had objected at trial to the introduction of parol evidence, a party waives an objection where a ruling is not requested after the trial court fails to make one.  
In re Marriage of Pylawka
, 277 Ill. App. 3d 728, 734, 661 N.E.2d 505, 510 (1996).  

Here, the record is devoid not only of plaintiff's objection to the introduction of parol evidence, but also of any request by plaintiff for a dispositive ruling on the issue.  Plaintiff even cross-examined several of defendant's witnesses as to the parol understandings of the parties.  If plaintiff had truly thought the evidence objectionable, why were the witnesses examined without a prior ruling from the court regarding the nature of their testimony?  Thus, without any facts in the record demonstrating plaintiff's opposition to the parol evidence, either by objection or request for ruling from the court, we are constrained to hold that plaintiff waived any objection to the parol evidence.

B. The Court's Construction of the Contract Was Not

 Against the Manifest Weight of the Evidence

Once a contract has been deemed ambiguous, its effect on the parties is a question of fact.  
Quake Construction
, 141 Ill. 2d at 288-89, 565 N.E.2d at 994.  In other words, while the question of ambiguity is one of law, the question of the effect of that ambiguity is one of fact.  We will not disturb a trial court's finding of fact unless it is manifestly against the weight of the evidence, as that court is in a superior position to determine credibility, weigh evidence, and determine the preponderance thereof.  
Rybicki
, 246 Ill. App. 3d at 301, 615 N.E.2d at 1244, citing 
Greene v. City of Chicago
, 73 Ill. 2d 100, 110, 382 N.E.2d 1205, 1210 (1978).

Here, we are presented with the trial court's finding that the contract was ambiguous and that "at some point during the contract *** [the pigs] were going to be one hundred percent Newsham genetically."  By this finding the trial court implied that the intent of the parties was to contract for the eventual sale of 100% Newsham genetic pigs.  Since this determination is not against the manifest weight of the evidence, we agree.

The facts of the case remain undisputed that both parties were aware, at the time of the contract's formation, that plaintiff's herd was not 100% Newsham.  Further, representatives of defendant acknowledged that the first several deliveries under the contract would not be fully Newsham, even acknowledging that the process of conversion might take up to one year.   Nonetheless, both plaintiff and defendant seemed to agree that this move would be made.  Certainly, defendant expected that the pigs would eventually become fully Newsham, a fact borne out at trial through the testimony of defendant's representatives.  But more critically, Shields, the vice-president of plaintiff, admitted that, under the contract, plaintiff would begin developing 100% Newsham pigs:

"Q.  And you said that it was envisioned, 

I think, by [plaintiff] and [defendant] that 

[plaintiff] would move towards 100 percent 

Newsham?

A.  That's correct.

Q.  That was the intent of the parties 

was [
sic
] was it not?

A.  That's exactly right."

In light of this trial testimony, we fail to see how plaintiff could have argued that a move to 100% Newsham genetics was not contemplated by the parties.  The manifest weight of the evidence regarding the parties' intended definition of "progeny from a Newsham line" indeed supports the trial court's construction of the contract.  As such, we are disinclined to reverse such a finding.

C. The Trial Court's Holding as to the Parties' Repudiation

Was Against the Manifest Weight of the Evidence

The question then remains, was the trial court correct in its determination that 
both
 parties had repudiated the contract?  Defendant argued that when it learned that plaintiff was producing its own gilts, in lieu of purchasing Newsham genetics, its subsequent repudiation was proper.  According to defendant, plaintiff's prospective inability to fully perform, that is, to provide 100% Newsham pigs as required under the contract, gave defendant just cause for repudiating in August.  Plaintiff's argument regarding any breach or repudiation was twofold.  First, defendant's refusal to accept 300 of the 680 in the April shipment constituted a breach as to those pigs not accepted.  Second, the defendant's unequivocal statement in August 1998, refusing to accept any more pigs, constituted a breach of the whole contract.

Presented with these arguments, and the facts of the case, the trial court found that the case presented "a situation where both parties repudiated the contract as opposed to either party breaching it."  At most, the court found that there had been "a breach with regard to one shipment in May."  Nonetheless, the court found for neither party.  Critical to this determination was the court's finding that plaintiff "put itself in the position where it could not meet the contractual terms."  According to the court, then, plaintiff repudiated the contract when it refused to proceed with the conversion plan.  Consequently, when defendant learned of this situation in the summer of 1998, it was justified in repudiating the contract in August 1998.

The determination of which party to a contract breached is a question for the trier of fact, and its finding will not be disturbed unless it is against the manifest weight of the evidence.  
Wells v. Minor
, 219 Ill. App. 3d 32, 43, 578 N.E.2d 133, 1345 (1991); see also 
Rybicki
, 246 Ill. App. 3d at 301, 615 N.E.2d at 1244.  Based on such a standard, we find that the trial court erred in denying the plaintiff's claim for damages based upon the defendant's refusal to accept 300 of the 680 pigs in the April shipment.  Further, we find that the trial court erred in holding that both parties repudiated the contract and reverse and remand for further proceedings.

 While not directly addressed by the parties, this case is readily resolved by reference to article 2 of the Uniform Commercial Code--Sales (Commercial Code) (810 ILCS 5/2-101 through 2-725 (West 1998)).  Certainly, the pigs fall within the Commercial Code's definition of "goods."  810 ILCS 5/2-105(1) (West 1998); see also 810 ILCS Ann. 5/2-105(1), Uniform Commercial Code Comment 1, at 73-74 (Smith-Hurd 1993).  Moreover, at trial, both parties acknowledged that their contract was governed by the Commercial Code.  Specifically, both parties referenced Commercial Code sections regarding the computation of damages.  We will thus address the parties' arguments within the Commercial Code's framework.

1. 
The
 
Trial
 
Court
 
Erred
 
in
 
Finding
 
Against
 

Plaintiff
 
as
 
to
 
the
 
March
 
1998
 
Delivery

We first address the trial court's finding that both parties had repudiated the contract insofar as it denied plaintiff's claim for damages arising out of the defendant's rejection of 300 of the 680 pigs delivered in April 1998.  In so finding, the court appears to have wholly ignored plaintiff's legitimate claim for breach of the contract as to the April delivery, preferring to declare a repudiation of the entire contract.  Since such a finding ignores the Commercial Code's provisions regarding seller's remedies for buyer's wrongful rejection, we reverse.

Quite simply, section 2-703 of the Commercial Code provides that, "[w]here the buyer wrongfully rejects or revokes acceptance of goods *** or repudiates with respect to a part or the whole, then with respect to any goods directly affected *** the aggrieved seller may *** (d) resell and recover damages *** [or] (e) recover damages for non[]acceptance."  810 ILCS 5/2-703 (West 1998).  Further, comment 2 to section 2-703 provides that "buyer's breach which occasions the use of the remedies under this section may involve only one lot or delivery of goods."  810 ILCS Ann. 5/2-703, Uniform Commercial Code Comment 2, at 412 (Smith-Hurd 1993).

Here, plaintiff's complaint sought damages not only for the rejected deliveries after the August 1998 repudiation by defendant, but also for the rejection of 300 of the 680 pigs in the April 24, 1998, delivery.  The record indicates that defendant rejected these pigs because one of its subsequent purchasers did not desire their delivery.  Yet the contract does not give defendant the right to reject a portion of a delivery in such a situation.  Plaintiff had contracted to deliver 680 pigs, and it properly tendered that number.  We fail to see how a rejection by defendant of 300 pigs in that delivery was not a breach.  Thus, the manifest weight of the evidence does not support the trial court's conclusion that plaintiff should not recover damages for the April 24, 1998, delivery.  Accordingly, we reverse the trial court's judgment as to that issue.

2. 
The
 
Manifest
 
Weight
 
of
 
the
 
Evidence
 
Does
 
Not
 
Favor
 
Defendant as
 
to
 
Plaintiff's
 
Repudiation
 
of
 
the
 
Whole
 
Contract

More critically to the contract as a whole, the trial court found that the evidence indicated a repudiation of the contract by both parties.  We disagree.   Again, two sections of the Commercial Code are directly on point.  First, the Commercial Code gives a promisee who suspects that the promisor will not perform the right to demand an assurance of performance.  810 ILCS 5/2-609 (West 1998).  That portion of the Commercial Code provides, in pertinent part that, "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return."  810 ILCS 5/2-609 (West 1998).

 Second, the Commercial Code's treatment of "anticipatory repudiation" is particularly relevant.  That section provides:

"When either party repudiates the con-

tract with respect to a performance not yet 

due the loss of which will substantially impair 

the value of the contract to the other, the 

aggrieved party may[:] 

(a) for a commercially reasonable time await performance by the repudiating party; or

(b) resort to any remedy for breach ***, even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and 

(c) in either case suspend his own performance or proceed in accordance with the provisions of this [a]rticle on the seller's 

right to identify goods to the contract notwithstanding breach or to salvage unfinished goods ***."  810 ILCS 5/2-610 (West 1998).

In the case 
sub
 
judice
, both parties have claimed that their suspension of performance is based on reasonable grounds for insecurity created by the other party.  For defendant, these "reasonable grounds for insecurity" arose when defendant learned, through Dr. Eggers and Catlett, that plaintiff was no longer buying Newsham genetics, but was attempting to make its own gilts.  From plaintiff's perspective, the "reasonable grounds for insecurity" were more explicit: defendant stated its own repudiation.

Thus, we are presented with two alleged repudiations and must determine the effect of either or both on the contract, with a deferential eye toward the trial court's finding that both parties repudiated.  Clearly, defendant's statement, in August 1998, that it would no longer accept any pigs from plaintiff was a repudiation of the whole contract with regard to the remainder of performances not yet due from plaintiff.  
P.R.S. International, Inc. v. Shred Pax Corp.
, 184 Ill. 2d 224, 243, 703 N.E.2d 71, 80 (1998) ("a buyer's statement of intent not to accept delivery of goods constitutes an anticipatory repudiation").  Had this statement been the only exchange of information between the parties with regard to future performance, this would be a very easy case; defendant would be liable under section 2-610 of the Commercial Code.

However, the facts of the case also present plaintiff's statements to Dr. Eggers and Catlett regarding his unwillingness to purchase additional Newsham semen or gilts.  Our task, then, is to determine whether this statement had any real effect on the parties' respective obligations.  Defendant has argued that this statement constituted an unequivocal repudiation, such that defendant could suspend its own performance under the contract.

We disagree.  Under the Commercial Code, repudiation results "from action which reasonably indicates a rejection of the continuing obligation."  810 ILCS Ann. 5/2-610, Uniform Commercial Code Comment 2, at 390 (Smith-Hurd 1993).  The Commercial Code's concept of anticipatory repudiation focuses on two distinct types of conduct engaged in by a prospective repudiator.  First, a repudiation may arise when the promisor, without justification, makes a statement that he cannot or will not perform.  Second, one may repudiate by voluntarily putting it out of his power to perform as agreed.  See Comment, 
The Uniform Commercial Code Section 2-609: A Return to Certainty
, 14 J. Marshall L. Rev. 113, 114-15 (1980); see also 1 White & Summers, Uniform Commercial Code §6-2, at 288-93 (4th ed. 1995).

Both the Commercial Code and the common law have long recognized that, to rise to the level of a repudiation, a promisor's language must be sufficiently clear and distinct to be reasonably interpreted to mean that the promisor cannot or will not perform.  See 
P.R.S. International, Inc.
, 184 Ill. 2d at 243, 703 N.E.2d at 80 (requiring a "clear" statement of intention not to perform); 
Bituminous Casualty Corp. v. Commercial Union Insurance Co.
, 273 Ill. App. 3d 923, 930, 652 N.E.2d 1192, 1197 (1995) (requiring a "positive and unequivocal manifestation of a party's intent not to render the performance promised"); 
In re Marriage of Olsen
, 
124 Ill. 2d 19, 24, 528 N.E.2d 684, 686 (1988) ("[d]oubtful and indefinite statements that performance may or may not take place are not enough to constitute anticipatory repudiation").

On the facts of this case, then, we do not see how plaintiff's ambiguous statements about not purchasing any additional Newsham gilts or semen can be clear enough to constitute an unequivocal intention not to perform.  We are persuaded in this determination by several factors.  First, plaintiff's alleged statement was made through several third parties, Dr. Eggers and Catlett.  Without a statement directly to defendant, we are not persuaded that plaintiff positively manifested an intention not to perform
(comment: 1).  Further, we do not see how plaintiff's statements about not purchasing any additional Newsham genetics and making its own gilts, on their face, constitute a repudiation of the contract.  The record does not indicate what percentage of plaintiff's herd was fully Newsham at that point in the contract and is similarly silent as to whether plaintiff would have needed to be purchasing gilts to fully comply with the contract terms regarding genetic makeup of the pigs.  Without more facts, we cannot agree that the manifest weight of the evidence favored either party, let alone defendant, on this issue.

Further persuading us is defendant's failure to request assurances under section 2-609 of the Commercial Code.  As noted above, that section permits a party to a contract to request adequate assurance of performance from the other party when reasonable grounds for insecurity arise with respect to his performance.  810 ILCS 5/2-609(1) (West 1998); 
Althoff Industries, Inc. v. Elgin Medical Center, Inc.
, 95 Ill. App. 3d 517, 522, 420 N.E.2d 800, 804 (1981).  Certainly, the statements of plaintiff, when they reached defendant, would have given defendant reasonable grounds for insecurity.  Under the Commercial Code, then, defendant would have had the right to inquire of plaintiff, in writing, as to its intention to perform under the contract.  But that was not done.  The statements allegedly giving rise to defendant's insecurity were made in June and "early summer" of 1998.  According to the undisputed facts, defendant then accepted two more shipments of pigs, on or about July 3 and 31 of 1998.

If indeed defendant actually believed the value of the contract to be impaired by plaintiff's alleged prospective inability to perform, why did it accept two more deliveries and fail to request assurances, as was its right under the Commercial Code?  While the Commercial Code 
permits
 a party to request such assurances, rather than 
requiring
 them as a condition precedent to recovery, defendant's failure to so request indicates that defendant initially might not have believed that plaintiff was repudiating the contract by not purchasing additional Newsham genetics. In all, we are not persuaded that the manifest weight of the evidence so favored defendant as to indicate a judgment against plaintiff.  Rather, we conclude the evidence as to plaintiff's repudiation of the contract, prior to defendant's August 1998 repudiation, is inconclusive.  We thus reverse and remand to the circuit court for further proceedings.

 
 
 
 III. RESPONSE TO DISSENT

Contrary to the dissent, the argument upon which this decision is premised, that plaintiff did not repudiate the contract, was presented both to the trial court and to this court.  The trial court specifically found that plaintiff's actions "would seem to be a repudiation of the contract by the plaintiff" and "this is a situation where both parties repudiated the contract."  Plaintiff's brief in this court set out, in the points and authorities, the issue whether the trial court erred "when it found that the plaintiff had repudiated the contract."

The dissent's complaint is not that the issue was not raised, but that the law, the appropriate section of the Commercial Code, was not cited.  Under that approach, a reviewing court could never consider a case not cited to it by the parties, not even a controlling decision of the supreme court.  The parties should not have the power to prevent our application of the law by failing to cite it, for whatever reason.  
In re Marriage of Rodriguez
 131 Ill. 2d 273, 545 N.E.2d ___ (1989), cited by the dissent (slip op. at 24), refers to the failure to raise issues, the failure to raise questions, not to the failure to cite legal authority such as the Commercial Code.  Because the question of plaintiff's repudiation was raised in the trial court, in fact was thoroughly litigated in the trial court, no argument can be made that the parties did not have the opportunity to present evidence on that question.    

IV. CONCLUSION

For the reasons stated, we affirm the trial court's judgment in part, reverse in part
, and remand for further proceedings.

Affirmed in part, reversed in part, and remanded.

MYERSCOUGH, J., concurs.

STEIGMANN, J., dissents.

JUSTICE STEIGMANN, dissenting:

This is a difficult case, both factually and legally.  The majority does a good job of trying to resolve these difficult issues, and in most instances, I would agree with the majority's decision.  However, I do not agree with it in this case because the decision is premised on an argument that plaintiff-appellant has never made, either at the trial level or to this court.  Accordingly, I respectfully dissent.

The majority decision rests upon an analysis of article 2 of the Commercial Code.  Slip op. at 14.  However, as plaintiff (with commendable candor) conceded at oral argument, plaintiff never argued at the trial level the application of the Commercial Code to the facts of this case.  In addition, on appeal to this court, plaintiff never argued for the application of the Commercial Code.  

In plaintiff's initial brief to this court, plaintiff articulated the issues presented for review as follows:  "I.  Did the trial court err in finding the contract ambiguous?  II. Did the trial court err when it found that the plaintiff had repudiated the contract?"  Nowhere in plaintiff's initial brief does plaintiff mention or cite the Commercial Code.  

In plaintiff's reply brief, plaintiff for the first time mentions the Commercial Code in support of plaintiff's claim that it never breached the contract.  However, Supreme Court Rule 341(g) does not permit parties to raise new arguments or theories in reply briefs.  Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(g), eff. October 1, 2001  ("The reply brief *** shall be confined strictly to replying to arguments presented in the brief of the appellee ***").  Obviously, without such a rule, appellees would be deprived of the opportunity to respond to appellants' arguments.  

In 
Rodriguez
, 131 Ill. 2d at 276, 545 N.E.2d at 732, the primary question presented on appeal was whether the mother in a child custody dispute had standing to execute on a penal bond that the father posted to secure his visitation rights.  The trial court entered an order permitting the mother to do so, but the appellate court reversed, holding that the mother did not have standing to execute on the bond because she was not named in the document.  
Rodriguez
, 131 Ill. 2d at 278, 545 N.E.2d at 733.  The supreme court reversed the appellate court, affirmed the circuit court's judgment, and held as follows:  

"We note initially that the record in this case reveals that no one at the trial level raised the issue of whether the mother had standing to execute on the bond.  The general rule is that questions not raised in the trial court are deemed waived and cannot be argued for the first time on appeal. [Citations.]  An exception to this waiver rule is found when an issue of public importance, decided by the appellate court but not by the trial court, is presented.  Under these circumstances, this court may consider the issue. [Citation.]  The appellate court in the case before us applied another exception to the waiver rule: when ignoring it will achieve a just result.  [Citations.]  The waiver rule should not be ignored, however, if the opposing party could have introduced evidence to contest or refute the assertions made on appeal, had he an opportunity to do so in the trial court."  
Rodriguez
, 131 Ill. 2d at 279, 545 N.E.2d at 733. 

In this case, we do not know what additional evidence or argument defendant might have presented at trial had plaintiff indicated that it was basing its claim upon the Commercial Code.  Normally, a defendant in a civil action should be required to respond only to the evidence and arguments the plaintiff presents at the trial level.  The majority's decision in this case essentially deprives defendant of its opportunity for a fair trial on the issues that this court has deemed dispositive, and that decision is therefore contrary to 
Rodriguez
.

The position of the appellant in 
Rodriguez
 was actually much stronger than the position of the appellant in the present case. At least the appellant in 
Rodriguez
 determined the correct issue to raise before taking its case to the appellate court.  However, as earlier stated, plaintiff in this case not only failed to cite the Commercial Code to the trial court, but it also failed to cite it on appeal--at least until the reply brief. 

It should also be noted that the first time the trial court will have called to its attention its supposed failure to properly apply provisions of the Commercial Code (even though none of those provisions were argued to that court) is when it receives this court's judgment.  There are very few circumstances in which this court should ever countenance such a result, and this case is certainly not one of them.  See 
In re Marriage of Harper
, 191 Ill. App. 3d 245, 246, 547 N.E.2d 574, 575 (1989).  

The majority mischaracterizes this dissent.  My concern is not that plaintiff failed to cite the appropriate section of the Commercial Code, but that plaintiff failed to cite 
any
 section of the Commercial Code either at trial or on appeal.  The majority rules in plaintiff's favor only after applying the Commercial Code to the facts of this case, something plaintiff has yet to do.  The trial court's musings about repudiation as it delivered its lengthy ruling can hardly overcome plaintiff's failure to present to the court the claim that the Commercial Code applies to the facts of this case.  

We should decide the cases as they come to us and address only those claims appellants raised below and in this court.  The parties deserve no more and no less.  That the facts before us might have supported a better claim (in our judgment) is beside the point.  Because plaintiff should lose this appeal based on the only claims properly before us, I respectfully dissent.

COMMENTS AND ANNOTATIONS
Comment 1:
I'm not particularly wedded to this statement.  The plaintiff's representative, Phil Shields, did testify at trial that he made a conscious decision in late April or May not to purchase any more Newsham gilts because he was afraid defendant was going to breach the contract.  He based this on their rejection of the 300 pigs in the April shipment.  But those were rejected simply because the buyer's buyers didn't need them.

Plus, he decided not to buy any more Newsham gilts after he had received a letter from a vet service informing him that he could convert his herd to 100% Newsham in 23 weeks.  So he can't claim ignorance of how to go about it.  But then again, this was just a proposal from the Newsham people ("I feel it would be in your farm's best interest to purchase feeder gilts as replacement breeding stock...") It could just as easily be viewed as a sales pitch.