2023 IL App (1st) 220490-U

THIRD DIVISION
September 20, 2023

No. 1-22-0490

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| GAS DEPOT, INC. d/b/a Gas Depot Oil Company, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 2016 L 1494 |
| AHMAD ZAHDAN; AZ SPE, LLC; MID-WEST OIL COMPANY, INC.; SWIFT FUEL TRANSPORT, INC.; EID I. AYESH; BRIDGEVIEW MART, INC.; NABEELAH AYESH; AJ GAS & MINI MART, INC.; | ) ) ) ) ) ) ) | |
| Defendants-Appellees | ) ) | |
| (Ifran Bhagat; Mohammed Ahmed; Mazhar Bhatti; First Choice Gas, Inc.; Harjinder Singh; Sandhu Petroleum, Inc.; Defendants). | ) ) ) | Honorable Daniel J. Kubasiak, Judge, presiding. |

JUSTICE DEBRA B. WALKER delivered the judgment of the court.
Justice Lampkin and Justice R. Van Tine concurred in the judgment.

**ORDER**

¶ 1    *Held:* The trial court did not abuse its discretion in imposing sanctions on plaintiff for discovery violations. The trial court did not err in granting defendants' motion for partial summary judgment. Affirmed.

¶ 2    Plaintiff Gas Depot, Inc. d/b/a Gas Depot Oil Company (Gas Depot) filed a multi-count

complaint alleging, *inter alia*, breach of contract against Ahmad Zahdan; AZ SPE, LLC (AZ);

Mid-West Oil Company, Inc. (Mid-West); Ifran Bhagat; Mohammed Ahmed; Swift Fuel Transport, Inc. (Swift); Eid I. Ayesh (Eid); Bridgeview Mart, Inc. (Bridgeview); Mazhar Bhatti; First Choice Gas, Inc. (First Choice); Harjinder Singh; Sandhu Petroleum, Inc. (Sandhu), Nabeelah Ayesh (Nabeelah); and AJ Gas & Mini Mart, Inc. (AJ Gas). During discovery, the trial court entered an order imposing sanctions against plaintiff for its failure to comply with the court's prior orders to disclose certain information to various defendants. Defendants Eid and Bridgeview (hereinafter the Bridgeview defendants) subsequently filed a motion for partial summary judgment pursuant to section 2-1005 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005 (West 2018)). Although the trial court initially denied the motion, it granted their motion to reconsider that denial and then entered summary judgment in their favor. On appeal, plaintiff contends that the court erred in (1) granting summary judgment in favor of the Bridgeview defendants, and (2) imposing sanctions against it for various alleged discovery violations. We affirm.[1]

¶ 3                                     BACKGROUND

¶ 4      Plaintiff is an Illinois corporation and a licensed distributor of petroleum products. AZ is an Illinois limited liability company owned and controlled by Zahdan. Zahdan also owns and controls Swift, an Illinois corporation in the business of transporting and delivering petroleum products. Midwest is an Illinois-based corporation and a competitor of plaintiff in the petroleum distribution business. Bhagat and Ahmed own and control Midwest. Eid owns Bridgeview, a gas station on South Harlem Avenue in Bridgeview, Illinois. Singh owns and controls Sandhu, an Illinois corporation. Sandhu is the owner of the property at which the gas station operates. Bhatti is the owner of First Choice. Nabeelah, Eid's wife, is the owner of AJ Gas.

---

[1] This appeal has been resolved without oral argument upon the entry of a separate written order pursuant to Illinois Supreme Court Rule 352(a) (eff. July 1, 2018).

¶ 5                                  *The Agreement*

¶ 6      On September 19, 2014, plaintiff entered into a "Motor Fuel Sales Petroleum Supply Agreement" (the Agreement) with the Bridgeview defendants for the sale of petroleum products and services. Pursuant to the Agreement, the Bridgeview defendants (collectively termed "Dealer" in the Agreement) agreed to purchase all petroleum products and services for Bridgeview from plaintiff. The term of the Agreement indicated that it would be for ten years, beginning on September 19, 2014.

¶ 7      Paragraph four of the Agreement, entitled "Term," provided as follows:

> "4. Term. The term of this Agreement shall be for Ten (10) years between the parties unless sooner terminated pursuant to Paragraph 13 below ("Initial Term")[.] This agreement shall automatically renew upon expiration of the Initial [T]erm for successive one-year terms (individually a "Renewal Term") unless no later than ninety (90) days prior to expiration of the Initial Term or any Renewal Term, either party provides written notice of nonrenewal to the other."

¶ 8      Paragraph 13, entitled "Terminations and Non-Renewal by [Gas Depot]," listed multiple circumstances under which it could unilaterally terminate the Agreement, including "Dealer's failure to comply with any provision of this Agreement" and "Dealer's failure to operate the [Bridgeview gas station] for seven (7) consecutive days, or such lesser period of time such that under the particular facts and circumstances constitutes as an unreasonable period of time."

¶ 9      Paragraph 14 ("Breach by Dealer; Liquidated Damages") set forth plaintiff's estimated loss of profits if Dealer breaches the Agreement. The estimate was to be calculated pursuant to a formula consisting of the following: the "[a]verage Monthly Motor Fuel Petroleum Sales (in

gallons) by Dealer over the proceeding [*sic*] 12 months x $0.02 per gallon multiplied by the remaining number of months in the Term of the Agreement" plus the "unamortized branding costs incurred by [plaintiff]," which "Dealer acknowledges *** shall amount to between $15,000.00 and $50,000.00 and shall be amortized on a straight line basis over the term of the contract."

¶ 10   Finally, the Agreement also contained various standard provisions. Paragraph 18 of the Agreement, entitled "Non-Waiver," stated that Gas Depot's failure to exercise any of its rights in the Agreement would not constitute "any waiver or modification of such rights." Paragraph 19 specified that the Agreement comprised "the entire agreement of the parties" and that all other and prior agreements and understandings were "merged herein and extinguished hereby." In addition, paragraph 20 ("Modifications or Amendment") provided that the Agreement could be modified or amended "only in writing, executed by both of the parties hereto." Although paragraph 25 of the Agreement ("Lease/Contract Length") indicated that the Agreement would run "concurrent with the terms of the Land Lease," the term "Land Lease" was not defined in the Agreement. Most importantly, there is a handwritten statement at the bottom of the last page of the Agreement providing as follows: "In the even[t] [the] current lease for the [D]ealer's Premises is not renewed or extended for any reason, this [A]greement shall be cancelled on the date of the lease termination [and] this contract will be cancelled." The dates "9/25" and "9/25/14" appear next to two signatures.

¶ 11                           *Gas Depot's Complaint*

¶ 12   On February 16, 2016, plaintiff filed a seven-count complaint against Zahdan, AZ, Mid-West, Singh, and Sandhu. Plaintiff subsequently amended its complaint several times. On June 26, 2018, plaintiff filed its third amended complaint against defendants, which is the operative complaint in this appeal. Although the complaint comprised 21 counts (all of which were resolved in defendants' favor), plaintiff notes that it only challenges the dismissal of 5 counts (counts II, III,

V, XX, and XXI) in this appeal: (1) breach of contract against the Bridgeview defendants (count II); (2) intentional interference with contract against Zahdan, AZ, and Swift (count III); (3) aiding and abetting against Midwest, Ahmed, and Bhagat (count V); (4) successor and alter ego liability against the Bridgeview defendants, Nabeelah,[2] and AJ Gas (count XX); and (5) conspiracy to defraud against the Bridgeview defendants, Nabeelah, AJ Gas, Zahdan, AZ, Midwest, Bhagat, and Ahmed (count XXI). Gas Depot made the following allegations in its complaint.

¶ 13    Count II (breach of contract) alleged that, around January 2016, the Bridgeview defendants (1) stopped purchasing petroleum products and services from and also processing credit card sales transactions through plaintiff; and (2) began purchasing petroleum products and services and also processing credit card sales through Midwest. Count III (intentional interference with contract) alleged that Zahdan, through AZ, purchased the "existing loan and mortgage" on Bridgeview and threatened to "evict and 'kick out' [Eid] and Bridgeview from the property" unless the Bridgeview defendants (1) terminated the Agreement with Gas Depot, (2) purchased petroleum products from Midwest instead, and (3) had Swift deliver those products. Count V (aiding and abetting against Midwest, Ahmed, and Bhagat) alleged that Midwest, Ahmed, and Bhagat were aware of Zahdan's actions in the "wrongful interference with" the Agreement and "gave credence to, assisted and aided" Zahdan in his acts.

¶ 14    Count XX (successor and alter ego liability) alleged that, following Gas Depot's discovery that the Bridgeview defendants had been purchasing petroleum products and processing credit card payments through Midwest, Gas Depot sent cease-and-desist letters to Zahdan, AZ, and Midwest. According to Gas Depot, shortly after it sent the letters, Eid and Nabeelah formed AJ and transferred all "personal property and inventory" from the Bridgeview station to AJ without AJ

---

[2] On February 8, 2019, the trial court dismissed counts XX and XXI with prejudice as to Nabeela. Plaintiff does not challenge that dismissal.

paying any "money or thing of value." Nabeelah (purportedly on behalf of AJ) then signed a credit card processing agreement with another company. Gas Depot further alleged that the phone number, business operations, financial accounts, employees of AJ were identical to those of Bridgeview, and that Nabeelah's title of president and owner of AJ was merely to "create the false impression that [Eid] is not the owner and operator of the gasoline station and mini mart."

¶ 15    Finally, count XXI (conspiracy to defraud) alleged that the Bridgeview defendants, Nabeelah, AJ, Zahdan, AZ, Midwest, Bhagat, and Ahmed conspired to "defraud Gas Depot of monies due it" by the Bridgeview defendants, obstruct Gas Depot's rights under the Agreement, and avoid the Bridgeview defendants' obligations under the Agreement. The cause later proceeded to discovery.

¶ 16                                    *The Motion for Sanctions*

¶ 17    On February 13, 2019, the Bridgeview defendants filed a motion to compel discovery and for sanctions.[3] They noted that, on July 20, 2018, they issued their Illinois Supreme Court Rule 213 (Ill. S. Ct. R. 213 (eff. Jan. 1, 2018)) interrogatories and their Illinois Supreme Court Rule 214 (Ill. S. Ct. R. 214 (eff. July 1, 2018)) document requests on Gas Depot. Pursuant to the respective rules, both documents requested responses within 28 days of the service of the documents. See Ill. S. Ct. Rs. 213(d) (eff. Jan. 1, 2018), 214(a) (eff. July 1, 2018). Among the items requested in the document production request were the following:

> "1.    All documents relating to the delivery or supply of
>
> petroleum products to the [Bridgeview] Fuel Station during the

---

[3]    Although entitled in part as a motion for sanctions, no specific sanctions against Gas Depot were requested; rather, Bridgeview and Eid sought in part "any further relief that is just and proper" in the relief section of their motion.

relevant time period, including, but not limited to, bills of lading and invoices.

*** 

2. All documents relating to payment for supply or delivery [of] petroleum products to the [Bridgeview] Fuel Station during the relevant time period, including, but not limited to, receipts and proof of payment.

*** 

3. All documents and records relating to petroleum product sales and deliveries to the [Bridgeview] Fuel Station during the relevant time period.

* * *

8. All documents showing or relating to your cost and wholesale pricing for all fuel sales made to the [Bridgeview] Fuel Station.

*** 

9. All documents that show or evidence that you sold to the [Bridgeview] Fuel Station wholesale fuel at $0.02 above cost during the relevant time period.

* * *

14. All documents evidencing invoicing and proof of payments for all motor fuel purchased by Gas Depot from Luke Oil Co., Inc. and subsequently delivered to the [Bridgeview] Fuel Station in 2014 and 2015."

7

In addition, the "relevant time period" was defined as, "from January 1, 2014, through the present."

¶ 18    The Bridgeview defendants stated that, despite having "repeatedly" communicated with Gas Depot's counsel, Gas Depot had not produced any answers or documents responsive to their requests. The motion indicated that Gas Depot's responses were more than five months overdue and that nearly three months had elapsed since Gas Depot's counsel had stated that responses would be forthcoming and additional time was needed to complete them.

¶ 19    On February 27, 2019, the trial court granted the Bridgeview defendants' motion, directing Gas Depot to "comply with all outstanding discovery and respond on or before March 13, 2019." The court did not impose any sanctions on Gas Depot.

¶ 20    On June 7, 2019, the Bridgeview defendants filed a motion for sanctions under Illinois Supreme Court Rule 219 (Ill. S. Ct. R. 219 (eff. July 1, 2002)).[4] The Bridgeview defendants noted that, although Gas Depot issued its answers and objection to the request to produce on March 13, 2019, no documents were produced. Counsel for the Bridgeview defendants contacted Gas Depot's counsel regarding the status of its document production. Eventually, Gas Depot produced some—but not all—documents requested. The motion further indicated that Gas Depot did not amend or supplement its responses to written discovery and that Gas Depot's supplemental document production "directly conflict[ed] with [Gas Depot's] answers asserting that no such documents exist." The Bridgeview defendants added that, as of the date of the motion, Gas Depot had not produced any additional documents or otherwise communicated as to the status of its document production.

¶ 21    On June 21, 2019, the trial court issued an order granting the Bridgeview defendants' motion in part. The court directed Gas Depot to comply with Eid's "Rule 214 Request to Produce

---

[4] Codefendants AZ, Swift, and Zahdan subsequently joined in this motion for sanctions.

request numbers 1, 2, 3, 8, 9, and 14" no later than 4 p.m. on July 19, 2019. The court stated that the scope of Gas Depot's production would run from September 19, 2014, through February 28, 2016. The court further directed that, for any requested document not in Gas Depot's "care, custody, or control," Gas Depot would have to produce an affidavit stating that it "does not possess the requested documentation." The court then continued the motion to July 25, 2019.

¶ 22 On September 30, 2019, the Bridgeview defendants filed a supplemental brief in support of their motion for sanctions.[5] The Bridgeview defendants noted that Gas Depot provided its verified "Revised and Supplemental Response" on July 23, 2019. Although this response produced documents relating to Gas Depot's fuel purchase and sale invoices from January 2015 through February 2016, there was no documentation relating to fuel purchases or sales in 2014. The motion recounted that Gas Depot's response included a verification page certifying that its supplemental responses were "full and complete and no other documents responsive to the foregoing requests for production are in Gas Depot's care, custody, possession[,] or control." The Bridgeview defendants then recalled that, during the deposition of Gas Depot's "corporate representative" on July 24, 2019, he revealed that there were additional documents responsive to the defendants' production requests that were available but had not been produced. Attached as an exhibit to the motion was a transcript of the deposition of Tanglis (Gas Depot's chief financial officer). The deposition transcript provides in part as follows:

"[DEFENSE ATTORNEY]: My question is: After September 19, 2014, through the end of 2014, being December 31st,

---

[5] The Bridgeview defendants subsequently filed a motion to amend their supplemental brief to include as an exhibit the deposition of plaintiff's president, George Nediyakalayil, and plaintiff's chief financial officer, Nick Tanglis. The trial court granted this motion.

2014, is it your testimony that Gas Depot never sold a single gallon of gas—

[PLAINTIFF'S ATTORNEY]: I'm going to object to the whole question—

[DEFENSE ATTORNEY]: -- to Bridgeview Mart --

* * *

MR. TANGLIS: Repeat the question, and the answer is 'no.'

From September, prior to January 1st, 2015, we had a previous database from a different -- excuse me, not a different.

We had a previous database that was corrupt, and any information of such would have to be requested by special requests from our data processing provider at a cost that was not readily available to us.

If such information for sales prior to 2015 is demanded, it has to be placed via court of law, because it costs Gas Depot extra money to obtain that information.

***

Q. When is that—when did that database become corrupted?

MR. TANGLIS: It was corrupted since the migration of an existing system to a new system in 2014.

Q. So at some point in 2014 the records of Gas Depot for the year 2014 were corrupted?

MR. TANGLIS: They were not exactly corrupted. There was erroneous data from two systems about sales.

10

So on January 1st, 2015, we went to a new database to maintain accurate records.

So that information is still available, we are being told from our data processor, but we have to pay for it to access that information.

Q. And in that data that was corrupted, would any of that data have been information relating to Gas Depot's sales to Bridgeview Mart?

MR. TANGLIS: It's data for all sales to all customers of Gas Depot.

Q. So it would have included Bridgeview Mart, Inc., correct?

MR. TANGLIS: If any sales were made, the answer is 'yes.' "

Tanglis further added that Gas Depot did not have the database for sales readily available for sales prior to 2015, but that if it were demanded, "we would have to go to our data processor and ask them to access a previous version of data, which they only have."

¶ 23    Gas Depot filed its response on October 28, 2019. Gas Depot stated that it "fully complied" with the trial court's order dated June 21, 2019. Gas Depot added that its July 19, 2019 production was limited to calendar years 2015 and 2016 but not 2014 because it did not have "documents for the sale of fuel to Bridgeview for calendar year 2014." Gas Depot complained that defense counsel "rushed to file" their supplemental brief but never sought "additional information or clarification" regarding Tanglis' testimony. Gas Depot argued, "It makes no sense and there is no reason for Gas Depot to incur the additional expense of contracting with the data processor vendor for the

simple reason that all defendants *** have all of the invoices from Gas Depot to Bridgeview for all sales of petroleum from the *** Agreement start date in September 2014 through the last purchase of fuel by Bridgeview from Gas Depot in January 2016."

¶ 24    Gas Depot attached the affidavit of Tanglis to its response.  In his affidavit, Tanglis stated that he "[stood] by" the testimony transcribed on pages 181 through 183 from his deposition on July 24, 2019.  Tanglis also stated as follows:

> "8.  Because of data errors in Gas Depot's off-site data base, Gas Depot switch[ed] data base[s] and in effect started fresh in January of 2015.  As a result, Gas Depot does not have sales information for 2014 in its database.
>
> 9.  As stated in the deposition session, it is possible that Gas Depot's outside data processing vendor is in possession of an old database of information which includes 2014.
>
> 10.  However, even if the outside vendor has the old database which was switched out because of erroneous date [*sic*], that database would only [provide] electronic copies of invoices from Gas Depot to Bridgeview for 2014 and no other documentation.
>
> 11.  To learn if the outside data processing vendor has the old data base and to obtain access to the old data base would require Gas Depot to contract with the data processor and incur additional expense."

Tanglis further explained Gas Depot's conclusion that "expending money to contract with the outside data processing vendor to possibly obtain documents that the Bridgeview defendants already had in their possession was neither prudent nor practical."

¶ 25    On November 4, 2019, the Bridgeview defendants filed their reply.  They argued that, regardless of the fact that the 2014 documents were not in Gas Depot's immediate possession (because they were stored on an off-site database with an undisclosed third party), the documents were nonetheless still within Gas Depot's control.  The Bridgeview defendants recounted Gas Depot's statement in the response that "[Gas Depot] could obtain records from this database at any time by contacting the third party *** but had chosen not to do so in order to avoid incurring costs *** from the third[-]party database host."  The Bridgeview defendants added that the trial court had found the documents relevant and discoverable in its order dated June 21, 2019.  They further explained that the records were relevant to establish whether Gas Depot performed its own obligations under the Agreement, and that Gas Depot was "attempting to conflate" the sales invoices to Bridgeview and Gas Depot's purchase invoices of the petroleum products it subsequently sold to Bridgeview.

¶ 26    On December 20, 2019, the trial court held a hearing on the motion for sanctions.  During the hearing, the following colloquy took place:

> "THE COURT:  I think the only way to resolve this, and I'm going [to] cut to the chase on it, either your client produces those 2014 records pursuant to my order, or at the minimum a negative inference can be made by the opposing party.
>
> MR. TINAGLIA [defense counsel]:  But I'm representing to the Court if Gas Depot was put to the task of doing that, the only thing that we're going to get is—
>
> THE COURT:  Have you seen these records?
>
> MR. TINAGLIA:  No, sir.

THE COURT: If you have not seen those records, I would strongly suggest that you qualify your statement that you believe that's all, because we've all had clients who have told us absolutely that there is nothing more. And sadly we have all had instances where we've discovered that, [']Oh, I was mistaken. There is something more.[']

So as far as these records, despite whatever costs, and that's the only thing I've heard is, [']Oh, we have to spend some money,['] well, we're spending money every day when people come to court. It's not a question of whether or not you're spending money discovering documents or you're spending money to pay your attorney to come to court. You're spending money. It's all fungible.

* * *

[THE COURT:] So your client has a choice. He could either, they can, it can, they can either decide to produce whatever these documents are based upon whatever manner they're being retained in, or not, but if he does not produce documents, I am going to assert that a negative inference can be drawn from the plaintiff's failure to produce these documents.

* * *

THE COURT: So, therefore, I'll give you an opportunity to produce those documents. And if those documents are not produced within some reasonable amount of time, and I don't know what that is, if it's 30 days, and counsel wishes to renew his motion for a

14

sanction in regard to those documents, I will entertain it. I think

that's all I can say."

The court subsequently asked the parties to provide draft orders on this motion by January 6, 2020.

¶ 27    On January 9, 2020, the trial court granted the Bridgeview defendants' motion for sanctions. The court recounted that it had issued two prior orders, in February and June 2019, compelling plaintiff to produce the records of its 2014 fuel purchases. The court further noted that, in plaintiff's response to the motion for sanctions, it attached an affidavit indicating that, although it had control over and could produce its 2014 fuel records, it chose not to do so "to avoid incurring an undisclosed cost." The court thus found plaintiff's conduct "willful and dilatory, impeding the discovery of relevant evidence, and in violation of Illinois Supreme Court Rule 219(c)." Among the sanctions the court ordered was that the Bridgeview defendants would be "entitled to an inference in their favor" that plaintiff withheld certain records for the year 2014 and that such records would tend to establish that it failed to comply with the Agreement's "fuel pricing" and "fuel branding" provisions. The court also sanctioned plaintiff by directing that all defendants would be entitled to an inference in their favor that, in 2014, plaintiff "commingled non-Citgo branded deliveries in with its motor fuel deliveries to Bridgeview." Finally, the court granted defendants leave to file their petition for attorney fees "associated with this motion." Defendants filed their petition for attorney fees, and the court subsequently awarded $9,512.50.

¶ 28                    *The Motion for Partial Summary Judgment*

¶ 29    On November 12, 2019, the Bridgeview defendants filed a motion for partial summary judgment on count II (breach of contract). The Bridgeview defendants argued, in essence, that the Agreement was not in effect at the time of the alleged breach because both the Agreement's original terms as well as the subsequent written modification "clearly indicate[d] that the parties did not intend to be bound to a ten-year supply agreement in the absence of a ten-year land lease

for the premises." In the alternative, the Bridgeview defendants argued that Gas Depot waived the enforcement of the ten-year term when it agreed to the written modification and then "proceeded under the supply agreement" knowing that there was no written lease in place. The Bridgeview defendants additionally argued that the price term in the Agreement was illusory based upon Gas Depot's testimony that the "daily market rack price" term in the Agreement was not defined, which rendered the Agreement unenforceable.

¶ 30    The Bridgeview defendants attached as an exhibit to their motion multiple exhibits including the deposition testimony of Nediyakalayil (Gas Depot's president), in which he admitted that he had signed the written modification. The Bridgeview defendants also attached an affidavit by Eid to their motion. This affidavit provided in relevant part as follows:

> "13.    On or about September 19, 2014, while acting as president of Bridgeview Mart, I executed a Motor Fuel Sales Petroleum Supply Agreement ("Supply Agreement") with Gas Depot, Inc. ("Gas Depot"). ***.

> 14.    The Supply Agreement contained a reference to a ten-year term, but this term was contingent upon a written lease term being granted to Bridgeview Mart by Sandhu.

> 15.    In order to clarify that the length term of the Supply Agreement was dependent upon Bridgeview Mart receiving a written land lease for the subject station, the handwritten modification found on the last page of the Supply Agreement was executed on September 25, 2014[,] by myself and *** Nediyakalayil, the president of Gas Depot.

16

16. On behalf of Bridgeview Mart, I sought to negotiate and obtain a written land lease for subject station from Sandhu in order to secure long term tenancy rights and obtain control of the fuel sales at the subject station.

17. Sandhu never offered or granted a written lease term to Bridgeview Mart, and the term of Bridgeview Mart's lease remained month-to-month throughout the time period that Bridgeview Mart operated the Subject Station.

18. A foreclosure action was initiated against Sandhu and the Subject Station during Bridgeview Mart's tenancy.

19. Sometime subsequent to the initiation of the foreclosure suit[,] the court appointed J2 Real Estate Group, LLC ("J2") as receiver for the Subject Station.

20. In December of 2014, Bridgeview Mart received a notice from J2 informing it that its tenancy at the Subject Station was being terminated effective January 20, 2015. ***.

21. Subsequent to receiving the notice of termination, I negotiated an oral agreement with J2 in order to obtain tenancy for Bridgeview Mart in exchange for monthly the [*sic*] fuel sale profits.

22. During the remainder of J2's receivership of the Subject Station, lease payments in the amount of the monthly fuel sale profits were made to J2. ***.

23. J2's receivership of the Subject Station ended in February of 2016.

24. In December of 2015, on behalf of Bridgeview Mart, I provided notice that Bridgeview Mart would be ending its tenancy at the end of February 2016 to both Sandhu and the Plaintiff in the foreclosure action, [AZ].

25. I also provided oral notice to Gas Depot that Bridgeview Mart's tenancy at the Subject Station was terminating at the end of February 2016.

26. Bridgeview Mart's tenancy was terminated at the end of February 2016, and Bridgeview Mart ceased operations at the subject station at that time."

Eid's affidavit also contained a handwritten document dated April 8, 2013, purportedly setting forth certain terms of the oral month-to-month lease. The handwritten exhibit stated that rent would be "2500/month"; "Gas is for Harji [*sic*]," who would have responsibility to fix the gas pumps or "any problem"; car wash proceeds would be "50/50 after expense"; and credit card proceeds would go to Harji "with the expense." The affidavit further included as an exhibit a copy of the lease termination notice issued to Bridgeview from "J2 Real Estate Group, LLC," indicating that the lease would be terminated as of January 20, 2015.

¶ 31 In addition, a transcript of Eid's deposition testimony was attached as an exhibit. Due to the disputed characterization of Eid's testimony in the case before us, we reproduce below a substantial portion of this testimony.

"Q. [(PLAINTIFF'S ATTORNEY)] When did you first lease space from Sandhu or Harjinder Singh?

18

A. Actually I did not sign a lease with him. The lease I took over with a friend of mine and his brother. So my friend signed the lease and I partnered with him on this station.

Q. But you had no written lease with this gentleman?

A. Not with Sandhu. Until 2014 when Gas Depot came in the picture and I signed the lease.

Q. You signed a lease for Gas Depot?

A. Yes.

Q. Is this lease --

A. Not a lease. A gas supply.

Q. A Fuel Supply Agreement?

A. Right.

* * *

Q. So back to Sandhu and Harjinder Singh. Did you have a written lease to lease the space at 8301 South Harlem in Bridgeview?

A. Yes.

Q. Did you have a Fuel Supply Agreement with them?

A. Yes.

Q. Subsequently you are saying that you signed one with Gas Depot?

A. Yes. Gas Depot wanted the gas agreement. I asked him to—actually I requested the gas supply agreement if I have a lease with Sandhu. Prior to that, I did not sign a lease with Sandhu.

19

Q. I see.

A. I signed based on the lease that he will give me.

Q. Okay. Did he ever give you that lease?

A. He never gave me that lease.

\* \* \*

Q. Okay, all right. I believe you testified that you did not have a written signed lease with Sandhu Petroleum, right?

A. Yes.

Q. I take it that also means you didn't have a written signed lease with Singh?

A. Yes. I don't remember signing. He was supposed to send me a lease when I signed the Gas Depot supply.

Q. Okay, but he never did?

A. He never did. At least I cannot recall. As far as I know, I did not get anything from Sandhu.

Q. So sitting here today, you don't remember ever getting a written lease from Sandhu or Singh?

A. Right.

\* \* \*

Q. You never had a lease with anybody on that property, right?

A. I never did.

Q. And neither one of the companies ever had a lease, right?

A. Exactly.

20

Q.  So there was never a lease [*sic*] whoever was operating that convenient store—

A.  No.  There was a lease but I did not sign the lease.

Q.  We have always been talking about a written lease that was signed and delivered to you.  There never was something like that, right?

A.  There was a lease but it wasn't my signature.  I was not responsible for the lease.

Q.  Are you talking about before?

A.  Before, right.

Q.  I'm not talking about when Bridgeview operated.  When AJ Gas and Minimart operated.  When you worked for those companies, there was never a written lease, right?

***.

[A.]  I don't know.

***.

Q.  Now you don't know?

A.  You are throwing all these questions on me.  I cannot even follow-up.  There was a lease for Bridgeview.  There was a lease but I never personally signed the lease.

Q.  Who signed it?

A.  Samir [Khatib].

Q.  Samir owned Bridgeview?

A.  He signed the lease but I owned the corporation.

21

Q. Samir signed a lease when he was operating the gas station, right? Is that what you are saying?

A. No. I was operating the gas station from day one. But it was his lease. He had the lease and I had the business.

Q. Now, I want you to consider your testimony earlier on. Did Bridgeview Mart Inc[.] ever have a written signed lease for 8301 South Harlem?

A. Maybe there was a lease.

Q. So before you said no and now you are saying maybe?

A. I mean, because I did not sign the lease.

Q. I'm not asking you who signed it. I'm asking you if there was a lease?

A. Yes, there was a lease.

Q. There was a Bridgeview Mart Inc[.] lease?

A. Yes.

Q. But you didn't bring it here today?

A. No. I didn't know.

MR. RODRIGUEZ [DEFENSE ATTORNEY]: He said he didn't sign it.

BY MR. TINAGLIA:

Q. When were you first aware—in spite of your testimony throughout this deposition that there was no written lease, when were you first aware that there was a lease?

A. I mean, there was a lease but I did not sign the lease.

Q. Who was the owner? Who was the landlord?

A. Sandhu.

Q. Who was the tenant?

A. Bridgeview.

Q. Well, I want to know when this was signed and why you changed your testimony?

A. I'm not changing.

***.

[A.] Yes, I'm not changing it. It's just the way you phrase the question.

[Q.] Well, no and maybe are two different answers.

[A.] Yes. There was a lease but I did not sign the lease. The only thing I signed was the gas supply based on a future lease from Sandhu which he never presented to me.

[Q.] You are saying two different things.

[A.] No, it's one thing.

***.

Q. So you said you signed the Gas Depot Supply Agreement?

A. Yes.

Q. Based on a future lease that you never received?

A. Right.

Q. But that aside, you are saying before that there was a lease?

23

A. There was a lease, yes, but I did not sign that lease."

In response to further questioning, Eid stated that Samir Khatib signed the lease, but Eid did not know whether Khatib signed the lease in Khatib's own name or on behalf of a company.

¶ 32    Gas Depot filed its response on December 31, 2019.  Gas Depot argued that the handwritten amendment did not modify the Agreement because the amendment referred to a "current lease" and not a "lease to be obtained."  Gas Depot added that evidence as to the existence of a written lease was "all over the board" based upon Eid's deposition testimony.  Gas Depot stated that, before signing the Agreement, Eid made an oral representation to Nediyakalayil that Eid had a five-year written lease.  Gas Depot then argued that this was consistent with the term "current lease" in the handwritten amendment to the Agreement.  With respect to the Bridgeview defendants' alternative argument that it waived the ten-year provision, Gas Depot explained that paragraph 18 of the Agreement expressly provided that Gas Depot's failure to exercise any rights under the Agreement would not constitute a waiver of them.  Finally, Gas Depot countered that the price terms of the Agreement were not illusory because the Agreement stated that the price would be Gas Depot's then-current pricing of " '$0.01 per gallon over the daily market rack price, plus freight, and all applicable taxes.' "

¶ 33    Attached to Gas Depot's response was the affidavit of Nediyakalayil.  Nediyakalayil stated that, prior to signing the Agreement, Eid represented to him that Eid had a five-year written lease agreement for the gas station with "Sandhu Petroleum."  Nediyakalayil said that he agreed to Eid's handwritten amendment and "signed off on the amendment on September 25, 2014."  Nediyakalayil added that he believed the term "current lease" in the Agreement referred to a written five-year lease for the Bridgeview gas station that was already in existence and in Eid's possession.  Finally, Nediyakalayil stated that he did not understand that term to refer to a written lease Eid had to obtain or an oral agreement for a month-to-month tenancy.

24

¶ 34    On January 28, 2020, the Bridgeview defendants filed their reply.  The Bridgeview defendants argued that Nediyakalayil's affidavit contradicted his prior sworn deposition testimony in which (1) he stated that he could not recall whether he had asked Eid for Bridgeview Mart's lease and (2) his testimony contained no reference to a representation from Eid that a five-year lease existed.  The reply further pointed out that, even if this matter were raised before the summary judgment stage, it would not create a material issue of fact because this purported representation took place before plaintiff entered into the Agreement.  The Bridgeview defendants further argued that plaintiff's contention that Eid's deposition testimony was contradictory improperly relied upon "cherry-picked quotes" from Eid's deposition.  According to the Bridgeview defendants, Eid's deposition testimony, when viewed in context, was "clear and consistent."  Finally, the reply included excerpts of Eid's deposition in which he stated that there had been a lease for the station, but he did not sign the lease.

¶ 35    On June 2, 2021, the trial court denied the motion for partial summary judgment.  The court found that there was a genuine issue of material fact based upon, *inter alia*, Eid's deposition testimony as to the existence of a written lease for the South Harlem property.

¶ 36    On July 2, 2021, the Bridgeview defendants filed a motion to reconsider the trial court's denial of their motion for partial summary judgment as to count II.  The Bridgeview defendants explained that the Agreement contained a merger clause, which confirmed that the Agreement was "an integrated contract and no other agreements or understandings apply other than what exists in the four corners" of the Agreement.  The motion further observed that Gas Depot's president acknowledged at his deposition that he signed the written modification.  The Bridgeview defendants added that Gas Depot's counsel's failure to understand the nature of the lease agreement—namely, that there was both a handwritten agreement regarding the amount of the rent payments and an oral agreement regarding Bridgeview Mart's continued tenancy—created

25

"confusion" during Eid's deposition. With respect to Gas Depot's assertion that Eid represented to Nediyakalayil that Eid had a five-year lease, the Bridgeview defendants further argued that this purported representation would not rebut or call into question evidence regarding the "termination" of the lease. The Bridgeview defendants stated that, at most, this allegation might support a tort claim but not one for breach of contract. In its response, Gas Depot argued for the first time that summary judgment was unwarranted because the term "lease" in the Agreement was not defined and therefore ambiguous, precluding summary judgment.

¶ 37    On October 21, 2021, the trial court granted the Bridgeview defendants' motion to reconsider and entered summary judgment on count II in favor of the Bridgeview defendants. On March 8, 2022, the parties entered into a stipulation noting that the following counts of the third amended complaint remained pending as of the date of the stipulation:  counts III, V, VI, XIV, XVI, XX, and XXI. The parties further stipulated that counts III (alleging intentional interference with contract), V (aiding and abetting), XX (successor and alter ego), and XXI (conspiracy to defraud) were "all dependent upon the existence of an enforceable contract." Finally, the parties stipulated to the following:  "the parties agree that an order shall be entered by the [c]ourt dismissing [c]ounts III, V, VI, XIV, XVI, XX and XXI[,] and said order shall state that it is a final and appealable order with no reason to delay enforcement or appeal.

¶ 38    On March 11, 2022, the trial court entered an order dismissing counts III, V, VI, XIV, XVI, XX, and XXI of the third amended complaint pursuant to the stipulation and further found that its order was a "final and appealable order with no reason to delay enforcement or appeal[,] all claims in the case having been determined." This timely appeal follows.

¶ 39                                    ANALYSIS

¶ 40    At the outset, defendants contend that Gas Depot's statement of facts in its brief is "a distortion of the record and merits dismissal of the appeal." Specifically, defendants complain that

26

Gas Depot's omissions include "repeated citations" in its statement of facts to the original, but not modified, Agreement. Defendants further argue that Gas Depot's statement of facts "fails to acknowledge the trial court's discovery orders" that preceded defendants' motion for discovery sanctions, including the order dated February 27, 2019.

¶ 41 We reject defendants' request for multiple reasons. First, the proper procedure is to file a motion to strike with this court upon service of the offending brief, rather than lie in wait and improperly bury the request in the body of the response. See *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009).

¶ 42 Furthermore, striking Gas Depot's brief and dismissing the appeal would be inappropriate. Defendants correctly note that Supreme Court Rule 341(h)(6) (Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020)) requires that an appellant's statement of facts must contain facts necessary to an understanding of the case, stated accurately and fairly. We further agree that supreme court rules are not mere suggestions; rather, they are rules that must be followed. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57. Although this court has the inherent authority to dismiss the appeal if an appellant's brief fails to comply with these rules (*Epstein v. Galuska*, 362 Ill. App. 3d 36, 42 (2005)), striking a brief for failure to comply with supreme court rules is a harsh sanction (*In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005)). Here, Gas Depot's brief sufficiently references both the modified Agreement as well as the trial court's order of February 27, 2019. Since we are able to understand the factual background of this case and dispose of the issues raised here, striking Gas Depot's brief for its purported deficiencies is unduly harsh and thus unwarranted. Accordingly, we reject defendants' request for this additional reason. We now consider the merits of this appeal, turning first to Gas Depot's claim that the trial court erred in granting the motion for partial summary judgment in favor of the Bridgeview defendants.

¶ 43                    *The Motion for Partial Summary Judgment*

¶ 44    Gas Depot contends that the trial court erroneously granted the Bridgeview defendants'

motion for partial summary judgment (following the court's granting of their motion to

reconsider).[6]  Specifically, Gas Depot argues in part that there was a genuine issue of material fact

regarding whether the contract was still in force at the time of the alleged breach.  Gas Depot notes

that its president, Nediyakalayil, stated in his affidavit (attached to its response to the motion for

partial summary judgment) that, before executing the Agreement, Eid had represented to him that

Eid had a five-year written lease for the premises.  Gas Depot further points out that Eid's

deposition testimony indicated that there was a written lease on the premises.  Gas Depot further

argues that it did not waive the enforcement of the Agreement and that the price terms in the

Agreement are not illusory.  Finally, Gas Depot asks that we also vacate the dismissal of counts

III, V, XX, and XXI because those counts were voluntarily dismissed as a result of the purportedly

erroneous entry of summary judgment against it on count II.

¶ 45    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."  735 ILCS 5/2-1005(c) (West

2018).  To determine whether there is a genuine issue of material fact, we construe the pleadings,

depositions, admissions, and affidavits strictly against the moving party and liberally in favor of

the opponent.  *MEP Construction, LLC v. Truco MP, LLC*, 2019 IL App (1st) 180539, ¶ 12 (citing

*Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 131-32 (1992)).  If

reasonable people would draw divergent inferences from undisputed facts, summary judgment is

inappropriate.  *Id.* (citing *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)).  It should be noted,

---

[6]  Gas Depot does not challenge the basis for the trial court's granting of the motion to reconsider.

however, that "[s]tatements in an affidavit which are based on information and belief or which are unsupported conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact." (Alteration in the original.) *Id.* ¶ 13 (quoting *Outboard Marine*, 154 Ill. 2d at 132). Nonetheless, it is well established that "facts contained in an affidavit in support of a motion for summary judgment which are not contradicted by counteraffidavit are admitted and must be taken as true for purposes of the motion." *Purtill v. Hess*, 111 Ill. 2d 229, 241 (1986) (citing *Heidelberger v. Jewel Cos.*, 57 Ill. 2d 87, 92-93 (1974)).

¶ 46    The essential elements of a breach of contract are:  (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) resultant injury to the plaintiff. *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 27.  The terms of an agreement, if unambiguous, should generally be enforced as they appear, and those terms will control the rights of the parties. *Id.* (citing *Dowd & Dowd, Ltd. v. Gleason,* 181 Ill. 2d 460, 479 (1998)).  Any ambiguity in a contract term, however, must be resolved against the drafter of the disputed provision. *Id.*

¶ 47    Plaintiff's contention of error concerns whether the Agreement was in existence at the time of the alleged breach, which in turn is based upon the interpretation of a contract.  Principles of contract interpretation are well settled.  Our primary duty in construing a contract is to give effect to the parties' intent at the time they entered into the agreement, as shown by the language used in the contract. *In re Doyle*, 144 Ill. 2d 451 (1991).  Illinois courts follow the "four corners rule" for contract interpretation, which requires that we initially look to the language of the agreement. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999).

¶ 48    If the language of the contract is facially unambiguous, then the trial court interprets the contract as a matter of law without the use of parol evidence. *Id.*  By contrast, if the agreement is ambiguous or reasonably capable of more than one interpretation, the court may consider parol

evidence to ascertain the parties' intent. *Id.* at 462-63; but see *Camp v. Hollis*, 332 Ill. App. 60, 68 (1947) (noting that it is a well-settled rule that, if a contract is susceptible of two constructions, the one that is "rational and probable" must be preferred). Nonetheless, a contractual term is not ambiguous simply because the parties disagree on its meaning. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004).

¶ 49 Of course, "[p]arties to a contract are not locked into its terms forever." *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 468 (2004). Accordingly, parties to an existing contract may, by mutual assent, modify the contract provided that the modification does not violate law or public policy. *Id.* A modification of a contract is a change in one or more respects that "introduces new elements into the details of the contract, or cancels some of them, but leaves the general purpose and effect undisturbed." *Id.* A modified contract containing a term that is inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the earlier contract's inconsistent term. *Id.* The modified contract creates a new single contract consisting of (1) the earlier contract's terms that the parties have *not* agreed to change, and (2) the new terms on which they have agreed. *Id.* Finally, when a contract is modified by a subsequent agreement, any lawsuit to enforce the agreement must be brought on the modified agreement and not on the original agreement. *Id.*

¶ 50 We review a trial court's entry of summary judgment *de novo. Outboard Marine*, 154 Ill. 2d at 102. In addition, whether there is an ambiguity in a contract is a question of law subject to *de novo* review. *Cincinnati Insurance Co. v. Gateway Construction Co.*, 372 Ill. App. 3d 148, 151 (2007) (citing *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407, 416 (2006)). Moreover, this court reviews the judgment, not the reasoning, of the trial court, and we may affirm on any grounds in the record, regardless of whether the trial court relied on those

grounds or whether the trial court's reasoning was correct. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995).

¶ 51    In this case, the trial court did not err in granting summary judgment in favor of the Bridgeview defendants on count II. The Agreement states that it comprised "the entire agreement of the parties" and that "all other and prior agreements and understandings" were merged into the Agreement and thus extinguished. The Agreement further provides that any modifications could only be made in writing and executed by both parties. Finally, the parties freely admitted that they modified the Agreement with the handwritten statement that, in the event the lease for the gas station was not renewed or extended for any reason, the Agreement would be cancelled on the same date as the non-renewal. The parties further acknowledged their respective signatures, dated September 25, 2014, agreeing to the handwritten amendment. Finally, Eid's affidavit included an exhibit consisting of a notice that the lease for the gas station was terminated effective January 20, 2015. Gas Depot did not provide a counteraffidavit or otherwise challenge this fact, so the trial court was obligated to take that notice as true for purposes of the summary judgment motion. See *Purtill*, 111 Ill. 2d at 241. Therefore, on these facts, the trial court correctly found that the written Agreement—which comprised the entire agreement between the parties—was cancelled upon the termination of the lease for the gas station. Although Gas Depot argues that its president was purportedly led to believe that Eid had a five-year written lease, that does not change the unrebutted fact that the nonrenewal of the lease for the gas station—regardless of whether the lease term was month-to-month, 5 years, or 500 years—would operate to end the obligations under the Agreement. Moreover, the Agreement contains an integration clause, which states in relevant part that "all other and prior *** understandings" are merged into the Agreement and "extinguished hereby." Therefore, since Gas Depot's president's prior understanding that Eid had a five-year lease was not incorporated into the Agreement, it is extinguished. Gas Depot's claim thus fails.

¶ 52    Gas Depot, nonetheless, maintains that the terms "Land Lease" and "current lease" are ambiguous, thereby precluding summary judgment. It relies heavily upon *Shields Pork Plus, Inc. v. Swiss Valley Ag Service*, 329 Ill. App. 3d 305 (2002), in support of this contention. Gas Depot's reliance, however, is misplaced. There, the plaintiff entered into a contract for the sale of "feeder pigs 'of a Newsham line' " to the defendant. *Id.* at 308. The plaintiff claimed the defendant breached the contract when it did not accept a portion of a delivery under the contract, and the defendant counterclaimed that the plaintiff breached the contract "when it abandoned all efforts to convert its pig herd to 100% Newsham genetics." *Id.* On appeal, this court agreed with the trial court that the contract was ambiguous, both with respect to the term "progeny" (which could involve descendants of (1) only a Newsham male, (2) only a Newsham female, or (3) both) and the term "Newsham line" (which was the shortened name for a company that sells genetic material for animal husbandry, raising the question of whether the parties intended that the animals to be bred must be Newsham or, rather, that the material used to breed merely "be from the Newsham company"). *Id.* at 311-12. Here, by contrast, the terms "Land Lease" and "current lease" unambiguously refer to the lease for the gas station. Gas Depot points to nothing in the record (nor do we find anything) that would indicate that there was some other lease that would be connected to a contract to purchase gasoline for a gas station. *Shields* is thus unavailing.

¶ 53    Since we have held that the trial court properly granted summary judgment based upon the written modification in the Agreement, we need not consider Gas Depot's alternative arguments that it did not waive enforcement of the Agreement and that the price term was not illusory. Finally, since we have held that the trial court did not erroneously grant summary judgment in favor of defendants, we reject plaintiff's final contention on appeal that we must vacate the dismissal of counts III, V, XX, and XXI. Plaintiff's claim of error on this point is thus unavailing.

32

¶ 54                                    *The Motion for Sanctions*

¶ 55    Gas Depot also contends that the trial court erred in granting defendants' motion for sanctions pursuant to Rule 219.  Specifically, Gas Depot argues that the factors involved in determining whether to impose sanctions "weighed heavily against" sanctioning it without first allowing it an opportunity to produce the invoices underlying the sanctions order.  Gas Depot concludes that its eventual production of the documents should have caused the trial court to vacate its sanctions order.  In the alternative, Gas Depot contends that, should we hold that the "entirety" of the trial court's sanctions order was not an abuse of discretion, the trial court nonetheless abused its discretion in that portion of the order "granting negative inferences against Gas Depot."  We first examine the propriety of the trial court's awarding defendants their attorney fees associated with their motion for sanctions.

¶ 56    Illinois Supreme Court Rule 219(c) provides in relevant part as follows:

> "If a party *** unreasonably fails to comply with any provision of part E of article II of the rules of this court (Discovery, Requests for Admission, and Pretrial Procedure) or fails to comply with any order entered under these rules, the court *** may enter, in addition to remedies elsewhere specifically provided, such orders as are just, including, among others, the following:
>
> *  *  *
>
> (iii) That the offending party be debarred from maintaining any particular claim, counterclaim, third-party complaint, or defense relating to that issue."  Ill. S. Ct. R. 219(c) (eff. July 1, 2002).

In addition, the rule provides that the trial court may also impose an appropriate sanction, which may include an order to pay the other party's reasonable expenses incurred due to the misconduct,

including reasonable attorney fees. *Id.* The rule, however, requires that, when a sanction is imposed, the trial court must "set forth with specificity the reasons and basis of any sanction so imposed" either in the judgment order or a separate written order. *Id.*

¶ 57 "The purpose of imposing sanctions is to coerce compliance with court rules and orders, not to punish the dilatory party." *Sander v. Dow Chemical Co.*, 166 Ill. 2d 48, 68 (1995); see also *County Line Nurseries & Landscaping, Inc., ex rel. Bankruptcy Trustee v. Glencoe Park District*, 2015 IL App (1st) 143776, ¶ 42. Furthermore, in the event of a "willful violation of a court order," the penalty imposed should be proportionate to the seriousness of the violation. *Id.* The factors a trial court should use in determining what sanction, if any, to apply are: (1) the surprise to the adverse party; (2) the prejudicial effect of the proffered testimony or evidence; (3) the nature of the testimony or evidence; (4) the diligence of the adverse party in seeking discovery; (5) the timeliness of the adverse party's objection to the testimony or evidence; and (6) the good faith of the party offering the testimony or evidence. *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 124 (1998). No single factor, however, is determinative. *Id.*

¶ 58 We will not disturb a court's decision to impose Rule 219(c) sanctions unless the record establishes "a clear abuse of discretion." *Id.* at 123. A court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view. *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009); *Maniscalco v. Porte Brown, LLC*, 2018 IL App (1st) 180716, ¶ 29.

¶ 59 Here, Gas Depot argues that, although defendants established the fourth and fifth factors—namely, diligence in seeking discovery and timeliness in objecting to the testimony or evidence, respectively—the remaining four factors weigh in its favor, and therefore sanctions were unwarranted. Defendants respond that Gas Depot has forfeited any claim regarding unfair prejudice, bad faith, punishment, and negative inferences because they comprise "bare

contentions" devoid of citation to relevant authority or the record on appeal to support those contentions. Forfeiture aside, Gas Depot's claim is meritless.

¶ 60 The record in this court reveals that, although requested in discovery, Gas Depot failed to fully produce records in its possession and control related to its fuel pricing and fuel deliveries to Bridgeview. The trial court ordered Gas Depot to produce those records on two separate occasions (and in response to defendants' motions to compel): in February 2019 and June 2019. Although it failed to produce those records, Gas Depot nevertheless submitted an affidavit of completeness attesting that all records responsive to the discovery requests that were in its "care, custody, possession[,] or control" had been produced. This statement, however, was false. Gas Depot's chief financial officer, Tanglis, testified at his deposition that there *were* additional documents responsive to defendants' request for production, but they were stored with a third party and Gas Depot did not want to incur some undisclosed cost to obtain them. Gas Depot's rationale for submitting a false statement to the court regarding its compliance with discovery—*i.e.*, solely to avoid some unspecified cost—weighs heavily against it with respect to the last factor (good faith). In addition, until the deposition, which took place after the motion for sanctions was filed, defendants were unaware of Gas Depot's improper act, which establishes the first factor (surprise to the adverse party). Defendants sought the improperly withheld documents to support its counterclaim that Gas Depot had breached the fuel pricing, branding, and other provisions of the Agreement, which further establishes the second and third factors (the prejudicial effect and nature of the proffered evidence). On these facts, we cannot hold that the trial court's imposition of sanctions by awarding defendants their attorney fees related to their motion for sanctions was arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view. As such, the court did not abuse its discretion in awarding attorney fees in favor of defendants. *Shimanovsky*, 181 Ill. 2d at 124.

¶ 61 Moreover, our holding is not altered by Gas Depot's citation to *Dyduch v. Crystal Green Corp.*, 221 Ill. App. 3d 474, 481 (1991). In that case, the plaintiff homeowner sued the defendant lawn-care business, alleging that the defendant breached their agreement to provide law maintenance and negligently failed to diagnose and treat insect infestations. *Id.* at 475. The defendant alleged that the plaintiff had willfully withheld the name of a witness who had inspected plaintiff's lawn. *Id.* at 479. In his report to the plaintiff, the witness opined that the plaintiff's lawn problem was " 'drought injury, possibly combined with insect damage.' " *Id.* The defendant coincidentally retained that same individual as its own expert witness shortly before trial. *Id.* The witness was unaware of the plaintiff's identity, and defense counsel had only presented the witness with a hypothetical set of facts. *Id.* The witness, however, became aware of the plaintiff's identity when he appeared in court on the first day of trial. *Id.* The defendant sought sanctions against the plaintiff for the failure to disclose either the witness's identity or report. *Id.* The plaintiff's response to the court was that the plaintiff was aware of the witness's report but " 'did not want to produce it.' " *Id.* at 480. The trial court granted the motion for sanctions and awarded the defendant "all of its costs in the litigation and one-half of its attorney fees." *Id.* On appeal, this court held that costs and fees awarded did not "relate to the misconduct that occurred" and concluded that the award was imposed strictly as a punishment. *Id.* at 481. We thus vacated the award and remanded the cause for a determination of what costs and fees were "directly related to and incurred as a direct result of [the] plaintiff's misconduct." *Id.*

¶ 62 Here, by contrast, the trial court's order granted defendants leave to file their petition for attorney fees solely associated with their motion for sanctions. It did not, as in *Dyduch*, award defendants their entire costs and one-half of their attorney fees for the *entire* litigation. Gas Depot's reliance upon *Dyduch* is therefore misplaced.

¶ 63    Since we have affirmed the trial court's granting of summary judgment on count II in favor of the Bridgeview defendants and rejected Gas Depot's ancillary claim that we should then vacate the stipulated dismissal of the remaining counts (counts III, V, XX, and XXI), no claims remain pending before the trial court.  As such, we need not consider Gas Depot's claim in the alternative, namely, whether the trial court abused its discretion in imposing as a sanction the granting of an inference in favor of the Bridgeview defendants regarding whether the records wrongfully withheld "tend[ed] to establish that Gas Depot failed to comply with" various provisions in the Agreement.  Gas Depot's final claim of error is therefore meritless.

¶ 64                                    CONCLUSION

¶ 65    The trial court did not err in granting the Bridgeview defendants' motion for partial summary judgment on count II, which obviates plaintiff's claim that we must vacate the dismissal of counts III, V, XX, and XXI.  Finally, the trial court did not abuse its discretion in imposing sanctions on plaintiff for various discovery violations.  Accordingly, we affirm the judgment of the Circuit Court of Cook County.

¶ 66    Affirmed.